IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

NED CHARLES MCNULTY, II,

Plaintiff,

v.

DR. BRIGETTE ESPINOZA,

Defendant.

OPINION and ORDER

25-cv-229-jdp

---

Plaintiff Ned Charles McNulty, II is a civilly committed patient at Sand Ridge Secure Treatment Center. McNulty, proceeding without counsel, alleges that defendant Dr. Brigette Espinoza is overmedicating him against his will. McNulty brings a claim under the Fourteenth Amendment Due Process Clause.

Espinoza moves for summary judgment. Dkt. 13. McNulty filed only a cursory opposition. Dkt. 18. The undisputed facts show that McNulty has a psychotic disorder that, if untreated, makes him dangerous to himself and others, and that treatment with antipsychotic medication, mood stabilizers, and other medications is in his medical interest. McNulty hasn't shown a liberty interest in avoiding involuntary treatment with medication, so I will grant the motion and close the case.

## UNDISPUTED FACTS

McNulty did not respond to Espinoza's proposed findings of facts, which are properly supported with admissible evidence. So I will accept Espinoza's proposed facts as undisputed. *See Allen-Noll v. Madison Area Tech. Coll.*, 969 F.3d 343, 349 (7th Cir. 2020) (stating that all litigants must comply with the court's orders and rules); *Smith v. Lamz*, 321 F.3d 680, 683 (7th

Cir. 2003) ("[A] failure to respond by the nonmovant as mandated by the local rules results in an admission."). Accordingly, the following facts are undisputed.

**A. McNulty's psychiatric history before transfer to Sand Ridge**

McNulty's psychiatric history dates to 1975. At that time, he was admitted to a mental health facility in Milwaukee because he was breaking into houses. In October 1987, McNulty was diagnosed with bipolar disorder. In total, McNulty has at least 11 inpatient admissions to mental health facilities. When he is psychiatrically unstable, McNulty has a history of delusional beliefs, bizarre statements, and erratic behaviors.

From July 2013 to June 2020, McNulty was admitted to Mendota Mental Health Institute (Mendota) after being found not guilty due to mental disease or defect of the charge of arson of a building without the owner's consent in Milwaukee County Case No. 2010CF219. Dkt 15 ¶ 6. The circuit court ordered McNulty committed to the care and custody of the Wisconsin Department of Health Services (DHS) for 25 years. *See* docket sheet in the '219 case.[1] At one point, McNulty was transferred to Winnebago Mental Health Institute (Winnebago) because he was too aggressive to be managed in a minimum-security facility like Mendota.

In June 2020, the circuit court approved a conditional release plan and McNulty was placed in a group home. Dkt. 17-2 at 1. But he escaped twice and was hit by a car during one escape. At the request of his conditional release team, in December 2020, the circuit court entered an order revoking McNulty's conditional release. McNulty was returned to Mendota.

[1] https://wcca.wicourts.gov/case.html.

In February 2021, a Mendota psychiatrist, Dr. Jacqueline Landess, sought an order from the Milwaukee County Circuit Court to treat McNulty on behalf of DHS. McNulty had exhibited a number of aggressive and dangerous behaviors since his return to Mendota, including: (1) swinging and throwing cups at staff; (2) threatening staff and other patients; and (3) destroying his room and property. *Id.* at 2. McNulty had also refused medication, generally stating that he had no need for it and did not like its side effects. *Id.* at 1–2. The circuit court granted the order, which allows DHS staff to involuntarily administer psychotropic medication to McNulty. *Id.* at 4. The circuit court found that involuntary administration of psychotropic medication is necessary because: (1) McNulty is not competent to refuse psychotropic medication; (2) McNulty poses a current risk of harm if not medicated; and (3) administration of medication is in his medical interest. *Id.*

**B. McNulty's admission to Sand Ridge and involuntary treatment with medication**

This case concerns whether Espinoza is overmedicating McNulty against his will. So I review the history of his treatment with involuntary medication, and the reasons for that treatment, in some detail.

**1. Admission and initial diagnosis**

In October 2022, McNulty was admitted to Sand Ridge from Mendota. Defendant Espinoza is employed by DHS as a psychiatrist at Sand Ridge. McNulty arrived with a diagnosis of schizoaffective disorder, a mental health condition that combines symptoms of schizophrenia (a psychotic disorder) with symptoms of a mood disorder such as bipolar disorder. Schizoaffective disorder affects how a person thinks, feels, and behaves, and it can make daily functioning difficult if not treated. There is no cure for schizoaffective disorder, but medication and therapy can help manage its symptoms.

Espinoza saw McNulty in early November 2022 for an initial psychiatric assessment. Espinoza agreed with the diagnosis of schizoaffective disorder and continued McNulty on fluphenazine 5 mg. Fluphenazine is an antipsychotic medication used to treat psychotic disorders and bipolar disorder. Fluphenazine caused McNulty "mild parkinsonism and very mild tardive dyskinesia (abnormal movements)." Dkt. 15 ¶ 15. "Parkinsonism is a medical term used to describe a disease typified by a group of signs and symptoms similar to that seen in Parkinson's disease, a neurological disorder that is characterized by the causing of abnormal or slow bodily movements." *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 715 (7th Cir. 1999).

**2. The onset of manic symptoms and increases in medication**

In late December 2022, a psychiatric nurse practitioner, Veronic Ruiz, saw McNulty. Ruiz described McNulty as manic based on several symptoms, including elevated mood, racing thoughts, lack of sleep, distractibility, and inappropriate questions to female staff members. Ruiz started McNulty on olanzapine 10 mg. Olanzapine treats mood conditions such as schizophrenia and bipolar disorder, and it specifically targets acute mania. Ruiz continued McNulty on fluphenazine 5 mg.

The next two days, McNulty was irritable and hostile. He showed other signs of instability, such as calling the police to report a break-in at his old apartment. Ruiz saw McNulty, who exhibited manic behavior, including making grandiose and threatening statements (e.g., he was friends with the mafia and they would do what he wanted). Due to McNulty's lack of improvement, Ruiz increased his olanzapine to 15 mg at noon and 20 mg at bedtime, and she continued him on fluphenazine 5 mg.

The next day, Ruiz reported that McNulty had shown some improvement but that he had slept for only four hours and remained manic. Ruiz increased his olanzapine to 20 mg

twice a day, and she prescribed 1500 mg of Depakote extended release at bedtime. Ruiz prescribed Depakote, a mood stabilizer, because she believed that McNulty had severe schizoaffective disorder that was resistant to treatment. Depakote has been shown to effectively treat acute mania.

In early January 2023, Espinoza continued McNulty on this plan of care. A lab test was pending. Lab testing was important because the difference between an effective dose of Depakote and one that can cause serious side effects is small.

Later that month, staff members reported to Espinoza that McNulty had been argumentative, temperamental, and inappropriate with them, which included making sexual jokes. Dkt. 15 ¶ 53. McNulty told Espinoza that his medications were making him tired, and she noted that he had been sleeping for approximately nine to 13 hours a day. McNulty's Depakote level was lower than optimal, so Espinoza increased it to 2000 mg. Espinoza continued McNulty on the same doses of olanzapine and fluphenazine.

**3. Adjustments in medication due to worsening side effects**

Near the end of the month, staff reported that McNulty was sleeping all night and for most of the day. Espinoza saw him and noted that he had decreased motor activity, including diminished blinking and speech latency. Espinoza suspected that McNulty had catatonia as a side effect of dopamine antagonists. Catatonia is a psychomotor syndrome with acute onset and prominent behavioral-motor abnormalities. Espinoza reduced McNulty's bedtime dose of olanzapine to 15 mg and discontinued fluphenazine. Espinoza continued McNulty on Depakote 2000 mg. The results of McNulty's lab testing were unremarkable.

The next day, Espinoza noted that McNulty had signs of parkinsonism. She reduced his morning dose of olanzapine to 10 mg, but she continued him on 15 mg at bedtime, along with Depakote. A day later, Espinoza reduced McNulty's bedtime dose of olanzapine to 10 mg.

In early February 2023, McNulty's slowed movement had not improved. To treat his catatonia, Espinoza started him on lorazepam 1 mg three times a day. Espinoza also continued McNulty on 10 mg of olanzapine at bedtime and Depakote 2000 mg. McNulty's condition did not improve on lorazepam, so Espinoza discontinued it two days later.

McNulty's condition remained mostly constant for the rest of February, though his mood was stable and he at times appeared more alert. He continued to sleep a lot and complained that he was "drugged up." *Id.* ¶ 87. By month's end, Espinoza had lowered his total daily dose of olanzapine to 10 mg, which she believed would improve his parkinsonism and excessive daytime sleepiness. At some point Espinoza prescribed 5 mg memantine daily, which is a neuroprotector targeting apathy.

McNulty's condition remained mostly constant from March 2023 to January 2024. He continued to display parkinsonism and slow movement, though he was alert and had a stable mood and steady gait. McNulty was sleeping up to 15 hours a day, though Espinoza's review of his medical records showed that he had been oversleeping for years.

During this extended period, Espinoza evaluated McNulty at least eight times and regularly ordered lab work. The level of olanzapine in McNulty's blood was subtherapeutic, but Espinoza decided not to increase that medication. The level of Depakote in his blood was in the therapeutic range. Espinoza believed that the benefits of McNulty's medications outweighed their risks.

In March 2024, Espinoza saw McNulty and noted worsening symptoms of parkinsonism, including "cogwheeling," a jerky, ratchet-like muscle stiffness. Espinoza reduced McNulty's olanzapine from 10 mg to 7.5 mg. Espinoza did not prescribe a lower dose because she was concerned that he could experience mania. She continued his prescriptions for Depakote and memantine. McNulty agreed to a trial of a low, 0.5-mg twice daily dose of benztropine, which treats parkinsonism.

The next two months, McNulty's cogwheeling and rigidity did not improve. So Espinoza gradually increased his benztropine to 1.5 mg twice daily.

Between June and September 2024, McNulty started to show fewer symptoms of parkinsonism. His mood was stable, though he remained aloof and isolative. McNulty refused a trial of amantadine to treat his parkinsonism. Espinoza did not make any medication changes during this period.

In late October 2024, lab work showed that the level of Depakote in McNulty's blood was near the high end of the therapeutic range. Espinoza decided to lower his Depakote dose to 1500 mg.

In November 2024, Espinoza saw McNulty. His symptoms of parkinsonism were worsening, so she discontinued benztropine and prescribed amantadine 100 mg at bedtime. Frail, elderly patients like McNulty generally tolerate amantadine better than benztropine. The next month, Espinoza saw McNulty and noted that his symptoms of parkinsonism had improved with no worsening of his psychotic symptoms. She continued him on the same medications.

**4. Recurrence of mania and medication adjustments**

In February 2025, McNulty became manic after contracting the flu. He was more animated, talkative, and restless, and he was sleeping for no more than three hours at night. McNulty was also making grandiose and delusional statements and growing irritated when his statements were not validated. His other symptoms included mild euphoria, pressured speech, and racing thoughts. Espinoza decided to increase his olanzapine, but only to 10 mg a day considering his poor tolerance of antipsychotic medications. She also prescribed quetiapine 100 mg at bedtime for sleeping. Quetiapine is a weak dopamine blocker with a lower risk of neurological side effects. Espinoza continued McNulty's Depakote, memantine, and amantadine at the same levels.

A week later, McNulty was showing similar symptoms. On review of his medical records, Espinoza thought that it was appropriate to discontinue olanzapine and re-prescribe fluphenazine, and McNulty agreed. She started him on fluphenazine 5 mg at bedtime, planning to raise the dose to 5 mg twice daily. Similarly, the plan was to discontinue the olanzapine slowly. McNulty's other prescriptions stayed the same.

Near the end of the month, McNulty was still showing signs of mania, though he was sleeping through the night. Espinoza decided to increase fluphenazine to 5 mg in the morning and 10 mg at bedtime. The olanzapine would be completely tapered in a week.

**5. Improvement in manic symptoms**

In March 2025, Espinoza saw McNulty. He still showed slowed movement and diminished blinking. McNulty's manic symptoms had improved and he was sleeping through the night and napping during the day. Based on the sleep improvements, Espinoza reduced McNulty's quetiapine to 50 mg at bedtime, planning to discontinue it at the next appointment.

Espinoza continued McNulty on fluphenazine 15 mg, Depakote 1500 mg, memantine 5 mg, and amantadine 100 mg. The next month, noting that his symptoms were similar, Espinoza discontinued quetiapine. McNulty's medications stayed the same since that time and the filing of Espinoza's summary judgment motion.

I will discuss additional facts as they become relevant to the analysis.

## ANALYSIS

McNulty alleges that Espinoza is overmedicating him against his will. He is proceeding on a due process claim, and he seeks damages. Dkt. 1 at 6. I can infer that he also seeks injunctive relief, namely, adjustments in his medications or their levels.

Espinoza makes several arguments, including that the *Rooker-Feldman* doctrine bars McNulty's claim and that the claim fails on the merits. Because I am granting the motion on the merits, I need not address whether *Rooker-Feldman* applies.

Neither the Supreme Court nor the court of appeals "has decided whether civilly committed individuals have a constitutional right to refuse psychotropic drugs." *Kreger-Mueller v. Doe*, No. 18-cv-708-jdp, 2019 WL 4256832, at *4 (W.D. Wis. Sept. 9, 2019). But the Supreme Court has "held that prisoners have a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs." *Id.* I assumed for screening purposes that civilly committed patients like McNulty enjoy the same liberty interest, Dkt. 7 at 3, and I will do the same for purposes of this opinion.

"Any interest in avoiding unwanted administration of medication must be balanced against the state's competing interests, such as its interest in preserving public safety and the safety of the patient in question." *Id.* at *5. As a general rule, it is consistent with due process

to involuntarily treat a mentally ill prisoner with antipsychotic drugs if: (1) the prisoner is dangerous to himself or others and; (2) the treatment is in the detainee's medical interest. *Id.*

The undisputed facts show that McNulty is danger to himself and others. In granting the involuntary medication order, the circuit court determined that McNulty poses a current risk of harm if not medicated. When McNulty is psychiatrically unstable, he has a long history of delusional beliefs, bizarre statements, and erratic behaviors. To illustrate, McNulty was admitted to Mendota in 2013 after being found not guilty of arson due to mental disease or defect. While at Mendoza, he was transferred to Winnebago because he was too aggressive to be managed in minimum security. McNulty eventually stabilized and was conditionally released, but he twice fled from his group home and was hit by a car during one escape. After his return to Mendota, McNulty exhibited a number of aggressive and dangerous behaviors, causing Landess to obtain an involuntary medication order. Then, after transfer to Sand Ridge, McNulty showed signs of mania and instability, including threatening to get help from the mafia and making inappropriate sexual remarks to female staff members. Based on the undisputed facts, a reasonable fact finder could conclude only that McNulty poses a danger to himself and others if he is not medicated.

The undisputed facts also show that McNulty's treatment with involuntary medication is in his medical interest. Schizoaffective disorder, McNulty's primary diagnosis, affects how a person thinks, feels, and behaves, and it can make daily functioning difficult if not treated. Dkt. 15 ¶ 12; Dkt. 17-2 at 1. There is no cure for schizoaffective disorder, but medication and therapy can help manage its symptoms. Treatment typically involves antipsychotic medication in combination with a mood stabilizer. Dkt. 15 ¶¶ 44, 135. McNulty received fluphenazine (antipsychotic), olanzapine (mood stabilizer), and Depakote (mood stabilizer) for his

schizoaffective disorder. Espinoza has monitored and modified these medications and their doses depending on McNulty's symptoms. McNulty experienced serious side effects from these medications, but all medications carry potential side effects. *Id.* ¶ 129. And McNulty received other medications (i.e., lorazepam, memantine, benztropine, amantadine, and quetiapine) to treat those side effects. These medications, too, have been monitored and modified depending on his symptoms. Espinoza believes that the benefits of the medications that she has prescribed McNulty outweigh their risks, and that there are no acceptable alternatives to address his schizoaffective disorder. *See id.* ¶¶ 96, 129–30, 137, 146–47. A reasonable fact finder could conclude only that McNulty's involuntary treatment with medication is in his medical interest. I will grant Espinoza's motion and close the case.

ORDER

IT IS ORDERED that:

1. Defendant Dr. Brigette Espinoza's motion for summary judgment, Dkt. 13, is GRANTED.

2. The clerk of court is directed to enter judgment and close the case.

Entered September 3, 2026.

BY THE COURT:

/s/

JAMES D. PETERSON
District Judge